UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
J.C., individually and on behalf of J.R., a minor,

                                      :

                 Plaintiffs,

                                      :          15 Civ. 3345 (LAK) (AJP)

           -against-

                                      :     **REPORT AND RECOMMENDATION**

NEW YORK CITY DEPARTMENT OF
EDUCATION,                             :

                 Defendant.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Lewis A. Kaplan, United States District Judge:**

                 Plaintiff J.C. (represented by counsel) brings this action on behalf of her son J.R.

against the New York City Department of Education ("DOE"), seeking review of a December 31,

2014 decision by State Review Officer ("SRO") Nicholas Steinbock-Pratt that affirmed a finding,

following an impartial hearing, that the DOE offered J.R. a free appropriate public education

("FAPE").  (See Dkt. No. 1: Compl.)  J.C. challenges SRO Steinbock-Pratt's determination that

although the impartial hearing officer ("IHO") erred in excluding the testimony of J.C. and four

other witnesses, the error was harmless.  (Compl. ¶ 115-16.)

                 Presently before the Court are the parties' cross-motions for summary judgment.

(Dkt. Nos. 19 & 21.)  For the reasons set forth below, the DOE's motion (Dkt. No. 21) should be

DENIED and J.C.'s motion (Dkt. No. 19) should be GRANTED and the case remanded for a new

impartial hearing.

## FACTS

### Background

J.R. is a child with a disability, born in 1999.  (J.C. Ex. F: 1/12/06 Psychological Eval. at 2.)[1]  Evaluations from when J.R. was approximately three years old revealed delays in cognition, speech, motor skills and adaptive behavior.  (Id.)  J.R. exhibits academic delays (DOE Ex. 4: 1/22/11 Psycho-Educational Eval. at 6), and has severe language deficits (DOE Ex. 7: 1/29/11 Speech & Language Eval. at 2).  Prior individualized education programs ("IEPs") for J.R. from 2010 classified him as autistic (see J.C. Ex. H: 8/3/10 IEP at 3; J.C. Ex. I: 5/17/10 IEP at 3), as did a psychological evaluation from 2006, which also observed that "[i]t is important to note that [J.R.] does not meet the criteria for mental retardation" (1/12/06 Psychological Eval. at 6).  During the 2010-2011 academic year, when J.R. was in sixth grade, he attended the Cooke Center for Learning and Development, a private, not-for-profit school for students with disabilities.  (1/29/11 Speech & Language Eval. at 1.)

In January 2011, the DOE conducted a reevaluation of J.R. that included psycho-educational and speech-language assessments of J.R. and interviewed J.C. as part of a social history update.  (See 1/22/11 Psycho-Educational Eval.; DOE  Ex. 5: 1/22/11 Social History Update; 1/29/11 Speech & Language Eval.; DOE Ex. 16: O'Sullivan Aff. ¶ 14.)  These updated prior psychological evaluations conducted in October through December 2008.  (DOE Ex. 6: 2008 Psychological Eval.)  J.R.'s psycho-educational evaluation was conducted by DOE school psychologist Massiel DeCamps.  (1/22/11 Psycho-Educational Eval. at 1, 6.)  DeCamps administered a version of the Wechsler Intelligence Scale for Children.  (1/22/11 Psycho-

---

[1]     Unless otherwise indicated, the record is contained in Dkt. No. 17: Sealed Administrative Record.

Educational Eval. at 1; O'Sullivan Aff. ¶ 9.)

The test included both verbal and non-verbal components, measuring verbal comprehension, perceptual reasoning, processing speed and working memory. (1/22/11 Psycho-Educational Eval. at 7; Impartial Hearing Transcript ("Tr.") 83.) DeCamps also administered the Woodcock Johnson Tests of Achievement, a standardized, formal assessment of academic abilities (1/22/11 Psycho-Educational Eval. at 1; O'Sullivan Aff. ¶ 9), as well as conducting a clinical interview and reviewing J.R.'s records (1/22/11 Psycho-Educational Eval. at 1). J.R.'s results showed a full scale IQ of sixty-two, but a perceptual reasoning score of eighty-si; DeCamps noted that full scale IQ was not "the best indicator of [J.R.'s] true intellectual abilities." (1/22/11 Psycho-Educational Eval. at 2, 7.)

**The April 8, 2011 Committee on Special Education Meeting**

On April 8, 2011, the DOE convened a Committee on Special Education ("CSE") to prepare J.R.'s IEP for the 2011-2012 school year. (DOE Ex. 2: 4/8/11 IEP at 2; DOE Ex. 3: 4/8/11 CSE Meeting Minutes.) Present at the meeting were Nessan O'Sullivan, a DOE school psychologist and the district representative; Judy Sommers-Schneider, a DOE special education teacher and speech language pathologist; Marie Wise, a parent member of the CSE; J.R.'s father; Cooke educator Cindy Surdi; J.C. herself; and by telephone, Christy DiStephano, J.R.'s classroom teacher at Cooke. (4/8/11 IEP at 2; 4/8/11 CSE Meeting Minutes.)

At the CSE meeting, J.R.'s classification was changed from autism to intellectually disabled ("ID") based on O'Sullivan's analysis of the evaluative materials. (DOE Ex. 16: O'Sullivan Aff. ¶ 20.) At the end of the meeting, the DOE recommended placing J.R. in a classroom with twelve students, one teacher and one paraprofessional (a "12:1:1" classroom). (4/8/11 IEP at 2; O'Sullivan Aff. ¶ 31.) There is a dispute over whether J.C. or the Cooke representatives objected

to the change in J.R.'s classification and to the DOE 's recommendation:  According to O'Sullivan, neither the representatives nor J.C. specifically objected to the change or disagreed with the DOE's recommendation that J.R. be placed in a 12:1:1 classroom.  (O'Sullivan Aff. ¶¶ 16, 30.)  J.C. and Surdi maintain that they disagreed with changing J.R.'s classification and that J.R. would not receive enough support to make progress if placed in a 12:1:1 setting.  (Dkt. No. 18: 12/19/12 J.C. Aff. ¶¶ 36, 39-43, 48; Dkt. No. 18: Dec. 2012 Surdi Aff. ¶¶ 16, 18-19.)

**J.R.'s Placement At P.S. 226 And Enrollment At Cooke For The 2011-2012 School Year**

In June 2011, the DOE recommended that J.R. be placed in P.S. 226 in Manhattan for the 2011-2012 school year.  (J.C. Ex. B: 6/13/11 IEP Rejection Letter.)  J.C. visited P.S. 226.  (J.C. Ex. A: Impartial Hearing Request ¶¶ 50-55; see also Dkt. No. 18: 12/19/12 J.C. Aff. ¶¶ 55-58 & Dec. 2012 Surdi Aff. ¶¶ 23-27.)  Following her visit, J.C. rejected the DOE's recommendation because the students in the school's 12:1:1 classes were functioning at lower academic, behavioral and social levels than J.R.  (J.C. Ex. B: 6/13/11 IEP Rejection Letter.)  On June 13 and 14, 2011, J.C. signed enrollment contracts for J.R. with Cooke for the 2011-2012 school year.  (J.C. Exs. K & L: Cooke Enrollment Contracts.)

**Hearing Request And Prehearing Orders**

On September 5, 2012, J.C. filed a due process complaint requesting an impartial hearing alleging that the DOE failed to appropriately evaluate J.R. prior to the April 2011 CSE meeting, inappropriately classified him as ID, that the resulting IEP was inappropriate for his needs, and that the DOE did not provide an appropriate school placement for him.  (See J.C. Ex. A: Impartial Hearing Request.)  J.C. sought an order directing the DOE to pay J.R.'s 2011-2012 school year tuition at Cooke.  (Impartial Hearing Request ¶ 64.)

In a pre-hearing order, IHO Mary Noe directed the parties to present their direct

witness testimony via affidavit and set an October 23, 2012 hearing date.  (IHO Ex. I: 8/31/12 Pre-Hearing Order ¶¶ 1, 3.)  On October 18, 2012, the DOE's counsel requested an adjournment due to the "Availability of Witnesses" (J.C. Ex. Z at 5: 10/18/12 Request for Adjournment), which IHO Noe initially denied (J.C. Ex. Z at 9: 10/19/12 Adjournment Denial), but subsequently granted (J.C. Ex. Z at 14: 10/22/12 Adjournment Grant).

In an October 23, 2012 pre-hearing order, IHO Noe again ordered that the parties' direct testimony be presented by affidavit and set a new hearing date of November 27, 2012.  (IHO Ex. I: 10/23/12 Pre-Hearing Order ¶¶ 1, 3.)  J.C. and the DOE both objected to the requirement that testimony be by affidavit.  (J.C. Ex. V: J.C.'s Objections to the 10/23/12 Pre-Hearing Order at 2-4; DOE Ex. 14: DOE Objections to the 10/23/12 Pre-Hearing Order at 1-3.)  In a November 14, 2012 order, IHO Noe denied both parties' objections to submitting direct testimony by affidavit and set a new hearing date of December 21, 2012.  (IHO Ex. II: 11/14/12 Decision & Order.)  IHO Noe ordered the DOE "to provide [J.C.] and the Impartial Hearing Office with their witnesses' affidavits by December 17th.  The parent's counsel is ordered to provide the district and the Impartial Hearing Office with their witnesses' affidavits by December 19th."  (Id.)  The order did not specify a time of day by which the affidavits were due.  (See id.)

On November 15, 2012, IHO Noe changed the hearing date from December 21 to December 20 because J.C.'s employer would not allow her to take December 21 off from work.  (DOE Ex. 18 at 6: 12/12/12 Minarcik Email.)  The DOE's counsel requested that the affidavit deadlines be moved one day earlier to reflect the rescheduled hearing date (id.), but IHO Noe did not amend her order (DOE Ex. 18 at 4: 12/12/12 Machado Email).

On December 14, 2012, the DOE produced its witness affidavits for P.S. 226 Site Coordinator Gregory Terry and O'Sullivan.  (Tr. 144-45.)  On December 18, 2012, J.C.'s counsel

produced a draft affidavit for Kate McGough, J.R.'s speech therapist at Cooke during the 2011-2012 school year.  (SRO Pet. ¶ 13; Tr. 151.)  On the morning of December 19, 2012, J.C.'s counsel produced draft affidavits for two more witnesses: Yamit Sasson, J.R.'s teacher at Cooke during the 2011-2012 school year, and Mary Clancy, director of Cooke's summer program.  (SRO Pet. ¶ 13; Tr. 152, 154, 161, 194, 259.)  At approximately 5 p.m., J.C.'s counsel produced finalized affidavits for her witnesses, including J.C.; McGough; Clancy; Sasson; Dr. Eugene Newman, an independent clinical psychologist; Dr. Francis Tabone, a school psychologist and head of the Cooke Center Grammar School; and Cindy Surdi, the Division Head of the Cooke Center Lower School during the 2011-2012 school year.  (SRO Pet. ¶ 14; Tr. 260-61; Dkt. No. 18: Witness Affs.)

**The Impartial Hearing**

On December 20, 2012, IHO Noe conducted the impartial hearing for J.R.  (1/4/13 IHO Decision at 2; 12/20/12 Tr. at 1.)  IHO Noe had specified by pre-hearing order that the parties were to submit direct testimony by affidavit and then call their witnesses at the hearing for cross-examination.  (IHO Ex. I: 10/23/12 Pre-Hearing Order.)  IHO Noe also stated that "[a]dditional direct examination that is not repetitive or irrelevant will be allowed."  (Id.)

Terry and O'Sullivan both testified on the DOE's behalf.  (Tr. 31-134, 241-51; DOE Ex. 15: Terry Aff.; DOE Ex. 16: O'Sullivan Aff..)  O'Sullivan testified about the April 2011 CSE meeting and the formulation of J.R.'s IEP for the 2011-2012 school year.  (Tr. 31-121; see also DOE Ex. 16: O'Sullivan Aff.)  O'Sullivan's affidavit denied that J.C. or Surdi objected to classifying J.R. as ID or to the DOE's recommendation that J.R. be placed in a 12:1:1 classroom.  (O'Sullivan Aff. ¶¶ 30, 36.)  O'Sullivan acknowledged that he "would not have changed a child's classification if the parent had disagreed with the evaluations or expressed a belief that they were in any way insufficient."  (Id. ¶ 16.)  According to O'Sullivan, "[a]utism was an inappropriate classification"

for J.R. (Id. ¶ 28.) Finally, O'Sullivan stated that the CSE team considered other recommendations before settling on a 12:1:1 placement in a public school (id. ¶ 37), and that J.R.'s "mother, as well as the representatives from the Cooke Center fully participated in the discussion" (id. ¶ 39). O'Sullivan's hearing testimony discussed the factors that made an ID classification but not an autism classification appropriate for J.R., explained the factors on which the DOE based its recommendation that J.R. be placed in a 12:1:1 program and described the April 2011 CSE meeting. (Tr. 31-121.) Terry testified that by reviewing J.R.'s IEP and the IEPs of other students in the class where J.R. would have been placed, he determined that the students in that class were academically, behaviorally, socially and emotionally similar to J.R., as well as describing the 12:1:1 program at P.S. 226 and the June 2011 visit by J.C. and Surdi. (Tr. 122-34; see also DOE Ex. 15: Terry Aff.)

IHO Noe permitted J.C. to present the testimony of McGough and Clancy. (Tr. 136-37, 154, 194.)[2/]  McGough testified primarily about J.R.'s speech therapy needs. (Tr. 154-93.) Clancy testified about the details of J.R.'s 2011 summer program at Cooke. (Tr. 194-207; see also J.C. Ex. X: Clancy Aff.)

The DOE's counsel objected to the testimony of J.C., Surdi, Dr. Tabone and Dr. Newman on the ground that J.C.'s counsel produced their affidavits too close to the hearing time; IHO Noe declined to admit the affidavits into evidence. (Tr. 144, 151-52, 208-09, 213-14, 216-17, 220-23, 227, 251-53, 261-62, 283-85.)[3/]  IHO Noe also indicated that J.C's counsel's submission of the affidavits to the DOE's counsel on the eve of the hearing was professionally inappropriate. (Tr. 138.) In addition, upon being informed that Surdi and Sasson were ill and unavailable to testify,

---

[2/]    Although the DOE objected to McGough's affidavit (Tr. 136-37), IHO Noe nevertheless permitted her testimony (see Tr. 154-93).

[3/]    Counsel for the DOE had no objection to admitting Sasson's testimony. (Tr. 208-09.)

IHO Noe refused to grant a continuance.  (Tr. 121-22, 134-35, 148, 209-16, 252.)  IHO Noe also excluded Surdi's testimony because IHO Noe considered it irrelevant and found that J.C.'s counsel had not explained why Surdi could not participate by phone.  (Tr. 216: "I don't see any documentation here with her name on it.  I'm not sure how she would enlighten the situation.  I don't understand why she can't participate by phone and so I'm going to preclude her testimony.")

**IHO Noe's Decision**

On January 4, 2013, IHO Noe denied J.C.'s claims and found that the "IEP provided the student's right to a FAPE."  (1/4/13 IHO Decision at 14.)  In addition to the hearing testimony, the record before IHO Noe included J.R.'s 2005-2006 psychological evaluation, his December 2008 psychological evaluation; his January 2011 psycho-educational evaluation; his March 2009, May 2010 and August 2010 IEPs; the challenged April 2011 IEP; and his Cooke Center progress reports for 2010-2011. (1/4/13 IHO Decision at 2-4.)

IHO Noe's decision included a detailed analysis of J.R.'s classification as ID, and noted O'Sullivan's testimony that J.R. did not have significant eye contact deficits or significantly atypical or unusual eye contact to warrant a classification as autistic.  (1/4/13 IHO Decision at 4-5, 8-12.)  IHO Noe discussed O'Sullivan's testimony that people with autism do not understand the motivation of others, a characteristic not consistent with the description of J.R. as showing "'a good understanding of the motivation of explorers.'"  (Id. at 5.)  Similarly, J.R.'s eagerness to participate in discussions, ability to retell personal narratives, and enjoyment of many friends were all uncharacteristic of people with autism disorders.  (Id. at 5.)  IHO Noe restated O'Sullivan's finding that J.R.'s IQ scores from 2006 to 2011 were highly consistent and demonstrated significant delays in intellectual functioning.  (Id. at 5-6.)

IHO Noe reviewed federal and state regulations defining the classifications of autism

and ID, and determined that "[b]ased on all the documents the IEP team reviewed and Mr. O'Sullivan's testimony as to the review of the documents," autism was "properly ruled out" for J.R. (Id. at 10.)  IHO Noe further found that IQ test results and J.R.'s academic reports for three years showed his intellectual functioning to be below average.  (Id. at 11.)  IHO Noe also found that there was adequate information in the record to determine that J.R.'s adaptive functioning was low enough to warrant classification as ID (id. at 10-11), and that the contemporaneous CSE meeting minutes evidenced no disagreement from J.C. regarding the classification (id. at 11).  IHO Noe therefore determined that J.R.'s classification as ID was appropriate.  (Id.)

IHO Noe reviewed J.R.'s academic performance, the IEP's academic and social/emotional management needs, the scope of the materials the CSE reviewed, and the recommended staffing ratio and related services.  (Id. at 13-14.)  IHO Noe concluded that "based upon the evidence submitted and the testimony in the hearing record . . . [the] IEP provided the student's right to a FAPE.  No testimony or documentation was submitted to find for an independent education evaluation.  In light of the foregoing, further discussion as to the appropriateness of the parent's placement is unnecessary."  (Id. at 14.)

**J.C.'s Administrative Appeal**

On February 8, 2013, J.C. requested that the SRO "annul the IHO's decision in its entirety and remand the case for new proceedings and the development of a full and fair record." (SRO Pet. ¶ 64.)  J.C. argued that IHO Noe had administered the hearing inconsistently, illogically and in violation of the IDEA and New York State law; that IHO Noe's exclusion of witness testimony denied J.C. the opportunity to be meaningfully heard and to challenge the DOE's evidence; and that the DOE had not met its burden to prove that it had offered J.R. a FAPE for the 2011-2012 school year.  (SRO Pet. ¶¶ 23-63.)  On March 19, 2013, the DOE answered, asserting

that it had provided J.R. with a FAPE and that Cooke was not an appropriate placement for J.R. (SRO Ans. ¶¶ 13-30, 46-56.)

**The SRO's Decision**

On December 31, 2014, SRO Nicholas Steinbock-Pratt dismissed J.C.'s appeal. (12/31/14 SRO Decision at 8.) The record on which SRO Steinbok-Pratt based his decision did not include any of the excluded affidavits on behalf of J.R. (Id. at 7 & n.8.) SRO Steinbock-Pratt found that the "manner in which IHO [Noe] implemented her orders . . . was inconsistent." (Id. at 4.) Because IHO Noe's prehearing order had not specified a time on December 19, 2012 by which affidavits were to be submitted to opposing counsel, SRO Steinbock-Pratt "agree[d] with [J.C.] that the IHO improperly imposed sanctions for a failure to comply with her directives regarding the exchange of affidavits." (Id. at 5-6.) SRO Steinbock-Pratt therefore found that "the IHO erred in excluding the parent's affidavits from the impartial hearing." (Id. at 6.)

SRO Steinbock-Pratt relied on Shinseki v. Sanders, 556 U.S. 396, 409-10, 129 S Ct. 1696, 1706 (2009), to determine that J.C., as the party seeking to have the IHO's judgment set aside because of that erroneous ruling, had the burden of showing prejudice. (12/31/14 SRO Decision at 6.) SRO Steinbock-Pratt determined that IHO Noe's improper exclusion of the affidavits was harmless error. (Id. at 6-7.) SRO Steinbock-Pratt reasoned that:

> [B]ecause the district bears the burden of establishing that it offered an appropriate program to the student, it is not immediately clear why the parent's inability to present direct testimony with regard to an issue on which she bore no burden of proof was harmful. To the extent the parent objects to the exclusion of the affidavit of the private psychologist, the hearing transcript indicates that the purpose of this affidavit would have been to challenge the district school psychologist's interpretation of the results of the January 2011 psychoeducational evaluation. However, as noted by the IHO, counsel for the parent was able to cross-examine the district school psychologist at length, and it is unclear why counsel for the parent could not challenge the district psychologist's interpretation of the psychoeducational evaluation using information obtained from the affidavits. Similarly with regard to

the affidavits prepared by the parent or the student's classroom teacher at Cooke, despite noting that the IHO did not inquire into the nature of the proposed testimony, the parent has made no offer of proof with regard to the contents of the affidavits nor any affirmative representations that the affidavits contained any statements tending to undermine the evidence presented by the district or that they contained evidence that could not have been introduced through cross-examination of the district witnesses. Although noting that the exclusion of her witnesses caused the testimony of district witnesses regarding the appropriateness of the recommended program to stand unrebutted, at no point does the parent assert any particular rebuttal that was or would have been included in the direct testimony of her witnesses, or that she could not rebut the testimony of the witnesses through a comprehensive cross-examination. Moreover, the parent has not submitted any of the excluded affidavits as additional evidence and requested that I consider them in my review of the IHO's decision. Accordingly, there exists no basis in the record or in the parent's submissions here to find this error was other than harmless.

(Id., fns. & record citations omitted.) SRO Steinbock-Pratt determined that although J.C. "did not

present evidence in the form of direct testimony from a number of her witnesses, she was able to

confront and cross-examine witnesses as guaranteed under the IDEA and State and federal

regulations (see 20 U.S.C. § 1415[h][2]; 34 CFR 300.512[a][2]; 8 NYCRR 200.5[j][3][xii])."

(12/31/14 SRO Decision at 7.)

SRO Steinbock-Pratt also found that "[w]ith regard to the classroom teacher who was

unavailable due to illness [i.e., Sasson], and to whose affidavit the district did not object, the IHO

inquired why the witness could not be made available by telephone, and counsel for the parent was

unable to provide an answer." (Id., record citation omitted.) SRO Steinbock-Pratt noted that

"[w]hile it would have been better practice to permit a brief adjournment for the illness of a witness,

the IHO offered to conduct a hearing on the following date," and therefore, the SRO did not find that

"the refusal to schedule another hearing date constituted an abuse of the IHO's discretion." (Id.)

SRO Steinbock-Pratt "examined the entire hearing record" and found that "the

testimony provided by district witnesses was consistent with the documentary evidence included in

the hearing record, including the district school psychologist's interpretation of the results of the

January 2011 psychoeducational evaluation as reflected in the April 2011 IEP." (Id.) SRO Steinbock-Pratt determined that "despite certain deficiencies in the evaluation alleged by the parent, the hearing record reflects the CSE was in possession of information provided by Cooke and that the student's then-current teacher and a Cooke supervisor also participated in the April 2011 CSE meeting. Accordingly, the hearing record supported the IHO's determination that the district offered [J.R.] a FAPE." (Id., record citation omitted.)

**The Excluded Affidavits**

J.C. submitted to the Court the affidavits that IHO Noe excluded at J.R.'s hearing. (See Dkt. No. 18: Witness Affs.) J.C. argues that "[t]his Court should review the excluded witness statements and affidavits in assessing [J.C.'s] request for remand." (Dkt. No. 20: J.C. Br. at 26; see also id. at 26-28.) The DOE does not object, instead arguing that "because the Plaintiffs have introduced the affidavits and draft affidavits of witnesses the IHO excluded from the hearing . . . . The Court . . . need not delve into whether, as a matter of theory, any evidence excluded could have rebutted the Defendant's showing that it offered a FAPE. Rather it may determine whether, if the Supplemental [Affidavit] Evidence had been offered . . . it would have rebutted Defendant's showing." (Dkt. No. 22: DOE Br. at 2.)

**J.C.**

J.C. is J.R.'s mother. (Dkt. No. 18: 12/19/12 J.C. Aff. ¶ 1.) J.R. was diagnosed with autism and first received special education services at the age of four when he attended a preschool program at the Kennedy Child Study Center. (Id. ¶¶ 3, 11.) For kindergarten, J.R. was placed in a 12:1:1 classroom in public school, but "[t]hings did not go well that year." (Id. ¶ 12.) The following year J.R.'s "school changed his classification to a child with Autism and a 6:1:1 class was recommended." (Id. ¶ 13.) Beginning in fall 2006, J.R. attended a non-public school for children

with autism, but by spring 2009, the school informed J.C. that J.R. needed a new program.  (Id. ¶ 15.)  J.C. enrolled J.R. at Cooke beginning in 2009, after a CSE was unable to find an appropriate program for him.  (Id. ¶ 16.)  J.C. believes that during J.R.'s time at Cooke, including the 2011-2012 school year, he "has made a lot of progress."  (Id. ¶ 17.)

As part of the 2011 psycho-educational and speech-language assessments of J.R., J.C. was interviewed for the social history update (id. ¶¶ 18-21), and was present for the April 8, 2011 CSE meeting (id. ¶ 22).  According to J.C., O'Sullivan "incorrectly stated that he reviewed the results of the psycho-educational testing and that he offered to explain the testing for [her].  He did not review the assessment reports, but said his decision was based on the results."  (Id. ¶ 28.)  J.C. also asserts that O'Sullivan "did not ask anyone if they agreed or disagreed with his conclusion," although both Surdi and DiStephano said they disagreed (id. ¶¶ 29, 36); there was "no discussion of the speech report or the social history interview and there was no discussion of Dr. Schumacher's 2008 evaluation" (id. ¶ 30); and discussion of adaptive behavior occurred only when Surdi said that ID was not an appropriate classification without adaptive testing (id. ¶ 39).  J.C. specifically disputes O'Sullivan's testimony that there were no concerns raised about the 2011 psycho-educational testing, his statement that the meeting reached a consensus to change J.R.'s classification from autism to ID, and his claims that there was a full discussion of J.R.'s deficits and proposed goals.  (Id. ¶¶ 38-49.)  J.C. states that at the end of the meeting she told O'Sullivan that she had concerns about J.R.'s overall program and planned to visit his placement to see if it was appropriate.  (Id. ¶ 51.)

When J.C. visited P.S. 226 with Surdi, a supervisor showed them two 12:1:1 classrooms.  (Id. ¶¶ 52, 56.)  The supervisor told J.C. that the first class would be too low functioning for J.R. based on J.R.'s mid-late second grade work in math and reading, and that the second 12:1:1 classroom was for students with behavioral issues, and J.C. found that it was "loud

and lacked structure."  (Id. ¶¶ 57-58.)

   J.R.'s "2012 IEP changed [his] classification back to Autism." (Id. ¶ 50.)

**Dr. Eugene Newman**

   Dr. Newman is a board certified clinical neuropsychologist and a certified school psychologist with a Ph.D. in clinical psychology.  (Dkt. No. 18: 12/19/12 Newman Aff. ¶ 1.)  He has over thirty years of private practice experience evaluating students with disabilities, twenty years experience conducting comprehensive psycho-educational and neuropsychological evaluations for the New York City DOE, and twenty years experience evaluating and treating students with autism. (Id. ¶¶ 2, 4.)  Dr. Newman reviewed documentation about J.R., including his recent IEPs and evaluations, but has not met him in person.  (Id. ¶¶ 5-7.)

   In Dr. Newman's opinion, J.R.'s January 2011 psycho-educational testing "does not sufficiently evaluate [J.R.'s] abilities in a manner that accurately reflects his previous diagnosis and his strengths and weaknesses" because it "fails to accurately and appropriately describe [his] cognitive potential."  (Id. ¶ 7.)  Dr. Newman also opined that "given [J.R.'s] reported significant expressive and receptive language disorders, best practice would recommend the use of non-verbal testing to ascertain a more accurate measure of cognitive skills and potential" and that a "review of the 1/22/2011 testing along with the previous 2008 and 2006 testing done at ICD reveals" that J.R. does not display deficient functioning in his cognitive and adaptive skills, as required for a diagnosis of ID.  (Id. ¶¶ 8, 9.)  Dr. Newman further opined that the January 2011 evaluation did not include necessary evaluation of J.R.'s adaptive behavior, and discussed in detail why although J.R.'s prior adaptive behavior assessments were outdated, they would not support a classification of ID even if the DOE had relied upon them.  (Id. ¶¶ 10-14.)

Finally, according to Dr. Newman:

> The education program for a child with an Intellectual Disability would be very different from a program for a child who is not Intellectually Disabled. Most significantly, the program for an Intellectually Disabled child would need to address adaptive behavior deficits. Additionally, the allocation of educational resources for a child with an Intellectual Disability would focus more on the acquisition of daily living skills and other adaptive skills and put far less emphasis on academic and educational services.

(Id. ¶ 16.)

### Cindy Surdi

Cindy Surdi is the Assistant Head of the Cooke Center Grammar School, and during 2011 served as the Division Head for Cooke's lower school. (Dkt. No. 18: Dec. 2012 Surdi Aff. ¶¶ 1, 8.) As part of her job, Surdi assists parents at IEP meetings and visits students' placements to "help parents identify appropriate placements and issues with proposed placements." (Id. ¶ 6.)

Surdi, who is familiar with J.R., attended the April 8, 2011 CSE meeting. (Id. ¶ 9.) According to Surdi, O'Sullivan stated at the outset that he would be relying on J.R.'s 2011 psycho-educational evaluation from the DOE, read from a partially pre-drafted IEP "most of which appeared to be portions of the 2011 IEP that were copied from the 2011 psycho-educational evaluation," and "stated that the CSE team had determined that [J.R.'s] classification should be changed from Autism to Intellectually Disabled." (Id. ¶¶ 11-13.) Surdi claims that she, J.C. and Christie DiStephano disagreed with that determination. (Id. ¶ 14.) Surdi also "expressed concern that such a drastic change of classification to ID was being done without a functional behavior/adapted life skills evaluation." (Id. ¶ 15.) According to Surdi, many portions of the IEP were not reviewed at the meeting. (Id. ¶ 17.) "At the end of the meeting, Mr. O'Sullivan stated the CSE team was recommending a District 75, 12:1:1 special class. [Surdi] expressed that this ratio would not offer enough support instructionally for [J.R.], given his needs and that [J.R.] required core academic

instruction in a small class with 1:1 teacher supports." (Id. ¶ 18.) J.C. objected that J.R. would not grow in such a setting, and in response, "Mr. O'Sullivan stated that the IEP was being written for a DOE school." (Id. ¶¶ 19-20.)

On June 10, 2011, Surdi visited P.S. 226 with J.C. (Id. ¶ 23.) After meeting with a supervisor and observing one of two 12:1:1 classrooms, Surdi "could tell that the students' work that was displayed was on a pre-kindergarten or kindergarten level. In June 2011, [J.R.] was functioning at a mid-late 2nd grade in most math and reading domains." (Id. ¶¶ 24-25.) According to Surdi, the supervisor "felt that this class would be too low functioning for [J.R.]," and opined that the other 12:1:1 class "was comprised of older students with behavioral issues and would not be suitable for [J.R.]." (Id. ¶¶ 25-26.)

**Yamit Sasson**

Yamit Sasson was J.R.'s reading, writing, and social studies teacher at Cooke during the 2011-2012 school year. (Dkt. No. 18: Dec. 2012 Sasson Aff. ¶¶ 1, 6.) She is certified in New York State as a general and special education teacher for grades one through six. (Id. ¶ 3.) The class in which Sasson taught J.R. had eight students, a head teacher, an assistant teacher, and two paraprofessionals for support. (Id. ¶ 10.) According to Sasson, "[d]uring the 2011-2012 school year, [J.R.] thrived in the small, highly structured setting he received at Cooke" and "required a significant amount of individualized instruction and 1:1 teacher attention and a program that addressed his language needs throughout the school day." (Id. ¶ 11.) Based on her intensive work with and observation of J.R., which her affidavit discusses in detail (id. ¶¶ 14-20), Sasson believes "that the setting, tools, strategies, and individualized teacher [J.R.] received at Cooke addressed his individual challenges" (id. ¶ 21).

**Dr. Francis Tabone**

Dr. Tabone has a doctoral degree in psychology and is a school psychologist and Head of the Cooke Center Grammar School.  (Dkt. No. 18: Dec. 2012 Tabone Aff. ¶¶ 1, 4.)  Based on his familiarity with J.R. and a review of J.R.'s records including J.R.'s 2006 and 2008 psychological evaluations, his 2011 evaluations by the DOE, his Cooke progress reports, and the April 8, 2011 IEP, Dr. Tabone is of the "professional opinion that [J.R.] was improperly classified as Intellectually Disabled on the 2011 IEP." (Id. ¶¶ 5-6.)  According to Dr. Tabone, J.R's 2006 and 2008 psychological evaluations are inconsistent with classifying J.R. as ID.  (Id. ¶¶ 9-14.)  Dr. Tabone also opined that his "review of the 2011 DOE psycho-educational also does not support a classification of Intellectually Disabled for [J.R.].  This testing obtained a full scale IQ of 62; however, [J.R.'s] Perceptual Reasoning score was 86, which is on 'low-average,' and is significantly higher than his Verbal scores; thus, does not support an Intellectually Disabled classification.  The 2011 evaluator noted that full scale IQ was not the 'best indicator of [J.R.'s] true intellectual abilities.'" (Id. ¶ 15.)

## ANALYSIS

## I.     THE IDEA'S REQUIREMENTS

States that receive federal funds under the IDEA must provide all disabled children with a free and appropriate public education ("FAPE").  20 U.S.C. § 1412(a); accord, e.g., M.O. v. N.Y.C. Dep't of Educ., 793 F.3d 236, 238 (2d Cir. 2015); C.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 71-72 (2d Cir. 2014); R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 174-75 (2d Cir. 2012), cert. denied, 133 S. Ct. 2802 (2013).  "'A [FAPE] must include special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits.'" C.F. v. N.Y.C. Dep't of Educ., 746 F.3d at 72 (quoting Frank

G. v. Bd. of Educ., 459 F.3d 356, 363 (2d Cir. 2006), cert. denied, 552 U.S. 985, 128 S. Ct. 436 (2007)); accord, e.g., M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 238-39.

To ensure that qualifying children receive a FAPE, a school district must create an IEP for each such child.  R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 175; accord, e.g., 20 U.S.C. § 1414(d); M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 239; C.F. v. N.Y.C. Dep't of Educ., 746 F.3d at 72.  "The IEP is 'a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 175; accord, e.g., M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 239; M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 224 (2d Cir. 2012).  "'The IDEA requires that an IEP be reasonably calculated to enable the child to receive educational benefits.'"  C.F. v. N.Y.C. Dep't of Educ., 746 F.3d at 72 (quoting R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 175); accord, e.g. E.H. v. N.Y.C. Dep't of Educ., 611 F. App'x 728, 729 (2d Cir. 2015).  Nonetheless, "'[t]he purpose of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.'"  C.F. v. N.Y.C. Dep't of Educ., 746 F.3d at 72 (quoting Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 130 (2d Cir. 1998)).[4/]  Thus, "[t]he IDEA's 'appropriate' education standard does not require that a child be provided with the optimal programmatic alternative."  C.F. v. N.Y.C. Dep't of Educ., 746 F.3d at 72; see also, e.g., Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 130.

---

[4/]   See also, e.g., M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 239 ("The IEP 'must be likely to produce progress, not regression, and must afford the student with an opportunity greater than mere trivial advancement.  However, it need not furnish every special service necessary to maximize each handicapped child's potential.'" (quoting M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 224)).

"'Since New York State receives federal funds under IDEA, it is obliged to comply with the requirements of this law.'" <u>M.H.</u> v. <u>N.Y.C. Dep't of Educ.</u>, 685 F.3d at 224 (quoting <u>Walczak</u> v. <u>Fla. Union Free Sch. Dist.</u>, 142 F.3d at 123). "'In New York, the state has assigned responsibility for developing IEPs to local Committees on Special Education . . . .'" <u>C.F.</u> v. <u>N.Y.C. Dep't of Educ.</u>, 746 F.3d at 72 (quoting <u>R.E.</u> v. <u>N.Y.C. Dep't of Educ.</u>, 694 F.3d at 175).[5/] CSEs "'are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others.'" <u>C.F.</u> v. <u>N.Y.C. Dep't of Educ.</u>, 746 F.3d at 72 (quoting <u>R.E.</u> v. <u>N.Y.C. Dep't of Educ.</u>, 694 F.3d at 175); <u>accord</u>, <u>e.g.</u>, N.Y. Educ. Law § 4402(1)(b)(1)(a); M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 239. "'In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs.'" <u>M.H.</u> v. <u>N.Y.C. Dep't of Educ.</u>, 685 F.3d at 224 (quoting <u>Gagliardo</u> v. <u>Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 107-08 (2d Cir. 2007)).[6/]

"'Parents who . . . believe that a FAPE is not being provided to their child may unilaterally enroll the child in a private school and seek tuition reimbursement from the school district' by filing what is known as a 'due process complaint.'" M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 239 (quoting Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist., 773 F.3d 372, 376 (2d Cir. 2014)); see also, e.g., 20 U.S.C. § 1415(b); N.Y. Educ. Law § 4404(1); <u>T.M.</u> v. <u>Cornwall Cent.</u>

---

[5/]   See also, <u>e.g.</u>, N.Y. Educ. Law § 4402(1)(b)(1); M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 239; <u>M.H.</u> v. <u>N.Y.C. Dep't of Educ.</u>, 685 F.3d at 224; <u>Walczak</u> v. <u>Fla. Union Free Sch. Dist.</u>, 142 F.3d at 123.

[6/]   Accord, e.g., <u>D.N.</u> v. <u>Bd. of Educ. of Ctr. Moriches Union Free Sch. Dist.</u>, No. CV 14-99, 2015 WL 5822226 at *2 (E.D.N.Y. Sept. 28, 2015).

Sch. Dist., 752 F.3d 145, 152 (2d Cir. 2014).  A due process complaint may challenge "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education." 20 U.S.C. § 1415(b)(6)(A); accord, e.g., M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 239.  "'Filing the complaint triggers an administrative procedure by which the board of education appoints an Independent Hearing Officer ("IHO") who conducts a formal hearing and fact-finding.'"  M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 239 (quoting Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist., 773 F.3d at 376); N.Y. Educ. Law § 4404(1).  A parent may appeal the IHO's decision to an SRO.   20 U.S.C. § 1415(g); N.Y. Educ. Law 4404(2); M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 239; T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d at 152.  An SRO's decision may be challenged by filing a civil action in state or federal court.  20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3)(a); M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 239; Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist., 773 F.3d at 376; T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d at 152.

## II.     LEGAL STANDARDS FOR REVIEWING IDEA CLAIMS

### A.     The Deferential Standard of Review For Summary Judgment on IDEA Claims

"IDEA actions in federal court are customarily resolved on summary judgment." M.C. v. N.Y.C. Dep't of Educ., 14 Civ. 6968, 2015 WL 4464102 at *3 (S.D.N.Y. July 15, 2015); see also, e.g., D.N. v. Bd. of Educ. of Ctr. Moriches Union Free Sch. Dist., No. CV 14-99, 2015 WL 5822226 at *9 (E.D.N.Y. Sept. 28, 2015).  "'Summary judgment in [the IDEA] context involves more than looking into disputed issues of fact; rather, it is a "pragmatic procedural mechanism" for reviewing administrative decisions.'"  M.O. v. N.Y. Dep't of Educ., 793 F.3d 236, 243 (2d Cir. 2015) (quoting A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 171 (2d Cir. 2009)); accord, e.g., R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 184 (2d Cir. 2012), cert. denied, 133 S.

Ct. 2802 (2013).  This "'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review.'"  C.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 77 (2d Cir. 2014) (quoting M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012)); accord, e.g., D.N. v. Bd. of Educ. of Ctr. Moriches Union Free Sch. Dist., No. CV 14-99, 2015 WL 5822226 at *9 (E.D.N.Y. Sept. 28, 2015).

"'While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  M.O. v. N.Y. Dep't of Educ., 793 F.3d at 243 (quoting A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d at 171); see also, e.g., E.H. v. N.Y. Dep't of Educ., 611 F. App'x 728, 729 (2d Cir. 2015).  Thus, the "'role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed.'"  C.F. v. N.Y.C. Dep't of Educ., 746 F.3d at 77 (quoting Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007)).[7/]

The Second Circuit has provided several examples as guidance for the degree of deference required:

> "By way of illustration, determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures.  Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations considering whether there have been objective indications of progress.  Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not.  And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency."

---

[7/]     Accord, e.g., R.B. v. N.Y.C. Dep't of Educ., 589 F. App'x 572, 574 (2d Cir. 2014); C.L. v. N.Y.C. Dep't of Educ., 552 F. App'x 81, 82 (2d Cir. 2014).

C.F. v. N.Y.C. Dep't of Educ., 746 F.3d at 77 n.7 (quoting M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 244).   Moreover, federal courts do not defer to IDEA administrative proceedings when determining questions of law.  See, e.g., E.M. v. N.Y.C. Dep't of Educ., 758 F.3d 442, 456-57 (2d Cir. 2014) ("we need not defer to the findings of state administrative officers on questions, such as contract interpretation or the requirements of standing, that fall outside of their field of expertise"); Lillbask v. State of Conn. Dep't of Educ., 397 F.3d 77, 82 (2d Cir. 2005) ("'[T]he "due weight" we ordinarily must give to the state administrative proceedings is not implicated with respect to . . . issue[s] of law,' such as 'the proper interpretation of the federal statute and its requirements.'").

### B.      The Burlington/Carter Test

"Parents who unilaterally place their child in a private school do so 'at their financial risk.'"  M.O. v. N.Y.C. Dep't of Educ., 793 F.3d 236, 243 (2d Cir. 2015) (quoting Reyes v. N.Y.C. Dep't of Educ., 760 F.3d 211, 215 (2d Cir. 2014)).   "'Under New York's Education Law § 4404(1)(c), the local school board bears the initial burden of establishing the validity of its plan at a due process hearing.  If the board fails to carry this burden, the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them.  This framework is known as the Burlington/Carter test.'"  M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 243 (quoting R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 184-85 (2d Cir. 2012), cert. denied, 133 S. Ct. 2802 (2013)); see also, e.g., N.Y. Educ. Law § 4404(1)(c); Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12-15, 114 S. Ct. 361, 365-66 (1993); Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 369-70, 105 S. Ct. 1996, 2002-03 (1985).

"According to the three-part Burlington/Carter test, the parents will be entitled to reimbursement if (1) the school district's proposed placement violated the IDEA, (2) the parents' alternative private placement was appropriate, and (3) equitable considerations favor

reimbursement." T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 152 (2d Cir. 2014); accord, e.g., C.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 74 (2d Cir. 2014).   At prong one of the Burlington/Carter test, "'[i]n determining whether an IEP complies with the IDEA, courts make a two-part inquiry that is, first, procedural and second, substantive.'"  M.W. v. N.Y.C. Dep't of Educ., 725 F.3d 131, 139 (2d Cir. 2013) (quoting R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 189-90).[8/]

"At the first step, courts examine whether there were procedural violations of the IDEA, namely, 'whether the state has complied with the procedures set forth in the IDEA.'"  R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 190 (quoting Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005).[9/]   "The initial procedural inquiry in an IDEA case is no mere formality, as adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." A.C.  v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 (2d Cir. 2009) (quotations omitted, quoting Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998)).[10/]   Nonetheless, "[p]rocedural violations warrant tuition reimbursement only if they "'impeded the child's right to a [FAPE],'" "significantly impeded the parents' opportunity to participate in the decision[-]making process," or "caused a deprivation of educational benefits'" . . . .  That is, parents must articulate how

---

[8/]   See also, e.g., T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d at 160; D.N. v. Bd. of Educ. of Ctr. Moriches Union Free Sch. Dist., No. CV 14-99, 2015 WL 5822226 at *10 (E.D.N.Y. Sept. 28, 2015); M.C. v. N.Y.C. Dep't of Educ., 14 Civ. 6968, 2015 WL 4464102 at *5-6 (S.D.N.Y. July 15, 2015).

[9/]   Accord, e.g., T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d at 160; D.N. v. Bd. of Educ. of Ctr. Moriches Union Free Sch. Dist., 2015 WL 5822226 at *10 ; M.C. v. N.Y.C. Dep't of Educ., 2015 WL 4464102 at *5.

[10/]   Accord, e.g., M.L. v. N.Y.C. Dep't of Educ., No. 13-CV-2314, 2015 WL 1439698 at *5 (E.D.N.Y. Mar. 27, 2015); Scott v. N.Y.C. Dep't of Educ., 6 F. Supp. 3d 424, 436 (2014).

a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process." M.W. v. N.Y.C. Dep't of Educ., 725 F.3d at 139 (2d Cir. 2013) (quoting R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 190); accord, e.g., M.L. v. N.Y.C. Dep't of Educ., 2015 WL 1439698 at *7; Scott v. N.Y.C. Dep't of Educ., 6 F. Supp. 3d at 436.

"The second part of the test examines the substantive adequacy of the IEP by asking whether it was 'reasonably calculated to enable the child to receive educational benefits.'" T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 160 (2d Cir. 2014) (quoting Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 207, 102 S. Ct. 3034, 3051 (1982)); see also, e.g., D.N. v. Bd. of Educ. of Ctr. Moriches Union Free Sch. Dist., 2015 WL 5822226 at *10. "'[A] school district fulfills its substantive obligations if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement.'" A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d at 173 (quoting Cerra v. Pawling Cent. Sch. Dist., 427 F.3d at 195 (2d Cir. 2005)); accord, e.g., Scott v. N.Y.C. Dep't of Educ., 6 F. Supp. 3d at 436.

If the court finds the IEP adequate, then "'the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end.'" M.C. v. N.Y.C. Dep't of Educ., 2015 WL 4464102 at *3 (quoting M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 (2d Cir. 2000)).[11]

"In Prong II [of the Burlington/Carter test], a parent must show that the private school's program was reasonably calculated to confer an educational benefit to the child." M.C. v. N.Y.C. Dep't of Educ., 2015 WL 4464102 at *4; see also, e.g., M.H. v. N.Y.C. Dep't of Educ., 685

---

[11]    See also, e.g., E.P. v. N.Y.C. Dep't of Educ., No. 14-CV-6032, 2015 WL 4882523 at *2 (E.D.N.Y. Aug. 14, 2015); M.R. v. N.Y.C. Bd. of Educ., 12 Civ. 6220, 2013 WL 4834856 at *6 (S.D.N.Y. Aug. 14, 2013).

F.3d 217, 245 (2d Cir. 2012) ("If an IEP is deficient–either procedurally or substantively–the court then asks 'whether the private schooling obtained by the parents [for the child] is appropriate to the child's needs.'" (quoting T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009)); D.N.  v. Bd. of Educ. of Cent. Moriches Union Free Sch. Dist., 2015 WL 5822226 at *14. "At a minimum, the program must 'provide some element of special education services in which the public school placement was deficient.'"   M.C. v. N.Y.C. Dep't of Educ., 2015 WL 4464102 at *4 (quoting Frank G. v. Bd. of Educ., 459 F.3d 356, 365 (2d Cir. 2006), cert. denied, 552 U.S. 985, 128 S. Ct. 438 (2007)).  "In Prong III, the court must determine whether equitable considerations support the parent's claim, including whether the parents acted unreasonably or failed to cooperate with school officials."  M.C. v. N.Y.C. Dep't of Educ., 2015 WL 4464102 at *4 (citing 20 U.S.C. § 1412(a)(10)(C)(iii)(III)); see also, e.g., D.N. v. Bd. of Educ. of Ctr. Moriches Union Free Sch. Dist., 2015 WL 5822226 at *16.

## III.  IHO NOE'S ERRONEOUS EXCLUSION OF THE MAJORITY OF J.C.'s EVIDENCE PREJUDICED HER CASE

SRO Steinbock-Pratt determined that IHO Noe erred in excluding J.C.'s evidence, but that the error was harmless and the record supported a finding that the DOE provided J.R. a FAPE.  (See pages 10-12 above.)  In this lawsuit, J.C. argues that IHO Noe's error was not harmless and that the excluded evidence (which she has submitted) supports her arguments that J.R.'s 2011-2012 IEP was both substantively and procedurally deficient at prong one of the Burlington/Carter test.  (See Dkt. No. 1: Compl. ¶¶ 115(a)-(g).)  In particular, J.C. argues that her witnesses would have presented testimony to support her claims that the DOE improperly evaluated the results of J.R.'s January 2011 psycho-educational evaluation, ignored objections by J.C. and Surdi at the CSE meeting to changing J.R.'s classification to ID, and ultimately provided J.R. with

a substantively inappropriate IEP.  (Id.; see Dkt. No. 20: J.C. Br.at 23-24, 28-29; Dkt. No. 23: J.C. Reply Br. at 9-10, 12, 14-15.)  J.C. asserts that as a result the "preclusion of testimony from [J.C.] and her four witnesses prevented [J.C.] from fully and fairly contesting the DOE's assertion that it provided J.R. with a FAPE."  (Compl. ¶ 116.)

        For the reasons discussed below, the Court finds that the exclusion of five of J.C.'s seven witnesses prejudiced her.

### A.    There Is No Dispute That IHO Noe Erroneously Excluded Evidence From J.C.'s Witnesses

        SRO Steinbock-Pratt determined that IHO Noe erred by excluding the affidavits and testimony of J.C. and her witnesses from being presented at the December 20, 2012 impartial hearing.  (See page 10 above.)  The DOE does not dispute SRO Steinbock-Pratt's determination (see generally Dkt. No. 22: DOE Br.), instead arguing only that J.C. "simply failed to make the required showing" that she suffered any prejudice as a result of IHO Noe's error (DOE Br. at 25-26).[12]

---

[12]    SRO Steinbock-Pratt also determined that IHO Noe did not abuse her discretion by excluding the testimony of J.R.'s 2011-2012 classroom teacher at Cooke, Sasson, by refusing to schedule another hearing date, finding that "[w]ith regard to the classroom teacher who was unavailable due to illness [i.e., Sasson], and to whose affidavit the district did not object, the IHO inquired why the witness could not be made available by telephone, and counsel for the parent was unable to provide an answer."  (See page 11 above.)  SRO Steinbock-Pratt noted "[w]hile it would have been better practice to permit a brief adjournment for the illness of a witness, the IHO offered to conduct a hearing on the following date," and therefore, did not find that "the refusal to schedule another hearing date constituted an abuse of the IHO's discretion."  (See page 11 above.)  J.C. argues that this finding was erroneous because "it is unclear why a witness being 'unavailable due to illness' does not constitute providing an answer for why the witness cannot testify by phone," because IHO Noe chose not to inquire into Sasson's illness when discussing Surdi's illness with Cooke's general counsel on the phone, because "once [J.C.'s] attorney agreed to appear at a hearing on December 21 to attempt to present [J.C.'s] case despite the fact that [J.C.] would not be present, the IHO abruptly withdrew the continuance offer."  (Dkt. No. 20: J.C. Br. at 21-22.)  The record supports J.C.'s description of IHO Noe's decisions during the hearing.  (See Tr. 210-16, 252.)  In any event, the DOE concedes that "the SRO found that the IHO's exclusion of five (continued...)

27

**B.     SRO Steinbock-Pratt Erred In Finding That The Exclusion Of J.C.'s Witnesses Was Harmless**

In determining that IHO Noe's erroneous exclusion of J.C.'s witnesses was harmless, SRO Steinbock-Pratt reasoned that "it is not immediately clear why the parent's inability to present direct testimony with regard to an issue on which she bore no burden of proof was harmful" and that J.C. did not "assert any particular rebuttal that was or would have been included in the direct testimony of her witnesses." (See pages 10-11 above.) SRO Steinbock-Pratt went on to find that J.C. "was able to confront and cross-examine witnesses as guaranteed under the IDEA and State and federal regulations" (see page 11 above), and concluded that "the hearing record supported the IHO's determination that the district offered [J.R.] a FAPE" (see page 12 above). SRO Steinbock-Pratt did not consider whether Cooke was a superior placement for J.R. (see generally 12/31/14 SRO Decision), presumably because his finding that the DOE provided J.R. a FAPE meant that the "'the state ha[d] satisfied its obligations under the IDEA and the necessary inquiry [was] at an end'" under prong one of the Burlington/Carter test. M.C. v. N.Y.C. Dep't of Educ., 14 Civ. 6968, 2015 WL 4464102 at *3 (S.D.N.Y. July 15, 2015); see cases cited at page 24 above.

Both the IDEA and the federal and state regulations cited by SRO Steinbock-Pratt guarantee parents both the rights to present evidence and to cross examine witnesses. See 20 U.S.C. § 1415(h)(2) (parents shall be accorded "the right to present evidence and confront, cross-examine, and compel the attendance of witnesses"); 34 C.F.R. § 300.512(a)(2) (any party to an impartial hearing has the right to "[p]resent evidence and confront, cross-examine, and compel the attendance of witnesses"); 8 N.Y.C.R.R. § 200.5(j)(3)(xii) ("The parents, school authorities, and their respective

---

12/     (...continued)
        witnesses was erroneous." (DOE Br. at 7, emphasis added.)

counsel or representative, shall have an opportunity to present evidence, compel the attendance of witnesses and to confront and question all witnesses at the hearing.").

Moreover, J.C.'s petition for review of IHO Noe's decision specifically identified at least two particular ways in which the excluded testimony would have rebutted the DOE's claim to have presented J.R. an IEP.  First, J.C. argued that her witnesses "would have spoken to and supported . . . numerous allegations made by the Parent in the [Due Process Complaint], including the inadequacy of the evaluations on which J.R.'s evaluations were based and the inappropriateness of J.R.'s IEP."  (SRO Pet. ¶ 41.)  J.C.'s underlying due process complaint requesting an impartial hearing outlined numerous specific factual allegations regarding the inadequacy of the evaluations upon which J.R's classification as ID was based, the inappropriateness of his 2011-2012 IEP, and the procedural inadequacies of the CSE meeting at which the IEP was developed. (See Impartial Hearing Request ¶¶ 26-57.)[13/]  Second, J.C. argued that her own excluded testimony "would also have spoken to the manner in which the IEP meeting was conducted and to the inappropriateness of the DOE's recommended school placement."  (SRO Pet. ¶ 41.)  As J.C.'s petition acknowledged, neither of the two witnesses IHO Noe permitted J.C. to call, McGough and Clancy, "spoke to [J.C.'s] FAPE-denial claims." (SRO Pet. ¶ 41.)  Thus, the record before SRO Steinbock-Pratt showed that IHO Noe's error prevented J.C. from presenting her only evidence to support her challenge to the basis of J.R.'s classification as ID and the recommendations contained in his IEP based on that

---

[13/]     This also demonstrates that while SRO Steinbock-Pratt found that "[t]o the extent the parent objects to the exclusion of the affidavit of the private psychologist, the hearing transcript indicates that the purpose of this affidavit would have been to challenge the district school psychologist's interpretation of the results of the January 2011 psychoeducational evaluation" (see page 10 above), the purpose of Dr. Newman's testimony would have gone beyond simply challenging the district school psychologist's interpretation of the results of J.R.'s 2011 psycho-educational examination.  (See pages 14-15 above.)

classification.

J.C. argues that SRO Steinbock-Pratt therefore misapplied Shinseki v. Sanders, 556 U.S. 396, 409-10, 129 S Ct. 1696, 1706 (2009), in determining that she failed to carry her burden of showing that IHO Noe's errors resulted in prejudice.  (Dkt. No. 20: J.C. Br. at 15-16.)  The Court agrees.  According to the Supreme Court in Shinseki, "[t]o say that the claimant has the 'burden' of showing that an error was harmful is not to impose a complex system of 'burden shifting' rules or a particularly onerous requirement." Id. at 410, 129 S. Ct. at 1706.  Rather, "the party seeking reversal normally must explain why the erroneous ruling caused harm." Id.  J.C.'s petition and the record before SRO Steinbock-Pratt showed that IHO Noe's error prevented J.C. from presenting her only witnesses to support her claims that J.R.'s 2011-2012 IEP was both procedurally and substantively inadequate and to rebut the testimony of O'Sullivan regarding the conduct of the April 8, 2011 CSE meeting.

In any event, as discussed in section III.D below, J.C.'s supplemental evidence, which consists of the affidavits excluded by IHO Noe, demonstrates that IHO Noe's error was not harmless.

## C.     The Court Will Consider J.C.'s Supplemental Evidence

J.C. has submitted the affidavits that IHO Noe excluded from the December 20, 2012 impartial hearing.  (See page 12 above.)  J.C. "respectful[ly] requests that this Court consider the submitted statements and affidavits . . . for the purpose of weighing her argument that this case should be remanded for a new impartial hearing."  (Dkt. No. 20: J.C. Br. at 26.)  This Court may consider evidence that is not part of the administrative record at the request of a party.  20 U.S.C. § 1415(i)(2)(C)(ii); Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380 (2d Cir. 2003) ("Federal courts reviewing administrative determinations under the IDEA must base their decisions on 'the preponderance of the evidence,' taking into account not only the record from the administrative

proceedings, but also any further evidence presented before the District Court by the parties."); A.W. v. Bd. of Educ. of the Wallkill Cent. Sch. Dist., No. 14-CV-1583, 2015 WL 1579186 at *3 (N.D.N.Y. Apr. 9, 2015) ("In the final analysis, the decision to admit additional evidence is entrusted to the sound discretion of the court, appreciating that supplemental evidence must be 'relevant, non-cumulative, and useful.'"); M.S. v. N.Y.C. Dep't of Educ., No. 13-CV-3719, 2013 WL 6028817 at *4 (E.D.N.Y. Nov. 13, 2013) ("the Circuits generally agree that 'the question of what additional evidence to admit in an IDEA judicial review proceeding . . . should be left to the discretion of the trial court.'"); A.R. v. N.Y.C. Dep't of Educ., 12 Civ. 4493, 2013 WL 5312537 at *11 (S.D.N.Y. Sept. 23, 2013) ("In IDEA appeals, 'courts generally accept evidence that was not withheld in bad faith, is relevant, and does not change the administrative review into a trial de novo.'").

J.C.'s supplemental evidence consists of the affidavits that J.C. would have introduced at the December 20, 2012 impartial hearing if IHO Noe had not erroneously excluded them.  (See pages 7-8, 12 above.)  Thus, J.C. clearly did not withhold the affidavits or the witnesses' testimony from IHO Noe in bad faith.  Similarly, there is no doubt that the evidence IHO Noe excluded was relevant to plaintiffs' claims that J.R.'s 2011-12 IEP did not provide him a FAPE, as it constitutes the only evidence supporting several of their arguments.  (See pages 28-29 above.) Finally, rather than objecting to the new evidence, the DOE argues that "because the Plaintiffs have introduced the affidavits and draft affidavits of witnesses the IHO excluded from the hearing . . . . The Court . . . need not delve into whether, as a matter of theory, any evidence excluded could have rebutted the Defendant's showing that it offered a FAPE.  Rather it may determine whether . . . it would have rebutted Defendant's showing." (Dkt. No. 22: DOE Br. at 2.)  The Court therefore will

consider this evidence in evaluating J.C.'s claim.[14/]

**D.      The Excluded Affidavits Demonstrate That IHO Noe's Error Prejudiced J.C.**

The excluded affidavits from J.C.'s witnesses would have supported J.C.'s claims that there were procedural and substantive inadequacies in J.R.'s 2011-12 IEP.   J.C.'s and Surdi's affidavits support J.C.'s argument that O'Sullivan ignored their objections to an essentially predetermined IEP at the April 8, 2011 CSE meeting and J.C.'s argument that O'Sullivan's testimony did not accurately characterize the meeting.   (See Dkt. No. 20: J.C. Br. at 23-24; J.C. Ex. A: Impartial Hearing Request ¶¶ 42, 47(d); see also pages 13, 15-16 above.)  Dr. Newman's testimony challenges the sufficiency of J.R.'s 2011 psycho-educational testing and discusses the differences between educational programs that would be appropriate for students who are intellectually disabled and those who are not (see pages 14-15 above), thus supporting J.C.'s argument that the DOE improperly evaluated J.R., leading to his misclassification and an inappropriate IEP (J.C. Br. at 24, 27-28; Dkt. No. 23: J.C. Reply Br. at 11-13).   Similarly, Dr. Tabone's testimony directly supports J.C.'s argument that the DOE drew the incorrect conclusions from the material it relied on to evaluate J.R.  (J.C. Reply Br. at 14-15; see page 17 above.)  Sasson's testimony that "[d]uring the 2011-2012 school year, [J.R.] thrived in the small, highly structured setting he received at Cooke" and "required a significant amount of individualized instruction and 1:1 teacher attention and a program that addressed his language needs throughout the school day" (see page 16 above), based

---

[14/]      J.C. inexplicably did not submit the excluded affidavits to the SRO or request that they be made part of the administrative record.  (12/31/14 SRO Decision at 7.)  Nonetheless, the DOE does not argue that by failing to do so, J.C. waived her right to ask this Court to consider the supplemental evidence, nor does the DOE argue that it would have been improper for the SRO to consider the evidence.  (See generally DOE Br.; Dkt. No. 24: DOE Reply Br.)  Instead, the DOE urges the Court to consider J.C.'s supplemental evidence. Therefore the Court will not address the issue of any potential waiver.

on her experience working closely with J.R., supports J.C.'s argument that a 12:1:1 placement was not appropriate for J.R. (J.C. Reply Br. at 12).  Similarly, according to Surdi, a 12:1:1 classroom "would not offer enough support instructionally for [J.R.], given his needs and that [J.R.] required core academic instruction in a small class with 1:1 teacher supports."  (See page 16 above.)

The DOE, however, asserts that based on the evidence before the SRO, J.R. received a FAPE (Dkt. No. 22: DOE Br. at 9-14), and that the "allegations in plaintiff's supplemental evidence would not have rebutted the showing that the DOE offered FAPE" (DOE Br. at 14-25). In particular, the DOE argues that J.C.'s "allegations regarding J.R.'s classification do not alter the fact that the offered program was appropriate" (DOE Br. at 15-21), that the "IEP team had sufficient evaluative material to provide a FAPE" (DOE Br. at 22-23), and that the "12:1:1 program was appropriate" (DOE Br. at 23-25).  For the reasons discussed below, none of these arguments are persuasive.

### 1.  The Supplemental Evidence Supports J.C.'s Challenges Both To J.R.'s Classification As ID And Whether His Resulting IEP Was Appropriate

The DOE raises three arguments in support of its claim that J.C.'s "allegations regarding J.R.'s classification do not alter the fact that the offered program was appropriate." (Dkt. No. 22: DOE Br. at 15.)  First, the DOE asserts that "[e]ven with consideration of the Supplemental Evidence, [J.C.'s] contention that the classification of ID was not appropriate [for J.R.] must be dismissed."  (DOE Br. at 15.)  Second, the DOE claims that "a dispute at the IEP meeting regarding classification would not have mandated a change to the IEP."  (DOE Br. at 17.)  Third, the DOE argues that J.C.'s "contentions regarding the classification do not challenge the finding that" J.R received a FAPE because J.C. "does not explain anywhere in her memorandum how the allegedly inappropriate classification of J.R. would have deprived him of the educational benefits to which

he was entitled.  She asserts that the excluded evidence would have supported a different classification, but she fails to connect this assertion to an allegation that the offered program was inappropriate." (DOE Br. at 18-19.)   All three arguments are unpersuasive.

As discussed at the beginning of section III.D., Dr. Tabone's and Dr. Newman's excluded testimony would have challenged the appropriateness of J.R's classification as ID.  (See page 31 above.)  The DOE argues that "even if the IHO had heard these witnesses, she would not have owed their opinions deference" both because "unlike the DOE evaluator, [Dr. Tabone and Dr. Newman] had not personally evaluated J.R." and because "it is the district, not privately hired experts, that deserves deference." (DOE Br. at 16.)  The DOE is correct that Dr. Newman had not met J.R. (see page 14 above), and Dr. Tabone did not specify how familiar he is with J.R (see page 17 above).  In support of its position, the DOE cites several cases (DOE Br. at 16) that support the proposition that the DOE is not required to adopt the opinions of a parent's hired experts, including Watson v. Kingston City Sch. Dist., 142 F. App'x 9, 10 (2d Cir. 2005) (that "privately hired experts recommended different teaching methodologies for [the student] does not undermine the deference the Court must pay to the District."), cert. denied, 546 U.S. 1091, 126 S. Ct. 1040 (2006).  These cases are inapposite.  J.C. does not argue that the DOE or this Court should defer to the opinions of Dr. Tabone and Dr. Newman, but rather that IHO Noe's exclusion of their testimony prejudiced J.C.'s case because if heard and credited by IHO Noe, their testimony could have undermined the DOE's claim that it provided J.R. an appropriate IEP.  As the DOE itself notes, the "'law does not require an IEP to adopt the particular recommendation of an expert; it only requires that that recommendation be considered in developing the IEP.'"  (DOE Br. at 16, quoting C.H. v. Goshen Cent. Sch. Dist., 11 Civ. 6933, 2013 WL 1285387 at *15 (S.D.N.Y. Mar. 28, 2013).)  IHO Noe's erroneous refusal to allow the testimony of Dr. Tabone and Dr. Newman, however, ensured that their

recommendations were not even considered in her review of J.R.'s IEP, prejudicing J.C.

The DOE also argues that even if J.C. "had demonstrated at the hearing that she and J.R.'s providers had vocalized a disagreement during the IEP meeting regarding the classification, the mere establishment of that fact would not have disturbed the finding that the IEP was appropriate" because while a "district must listen to the input of the parent . . . it is not required to alter its recommendation based on that input." (DOE Br. at 18.)  Under the IDEA, "'the fact that the District staff ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate in the development of the IEP, or that the outcomes of the CSE meetings were pre-determined.  A professional disagreement is not an IDEA violation.'"  T.F. v. N.Y.C. Dep't of Educ., 14 Civ. 3401, 2015 WL 5610769 at *5 (S.D.N.Y. Sept. 23, 2015); see also, e.g., A.P. v. N.Y.C. Dep't of Educ., 14 Civ. 477, 2015 WL 4597545 at *8 (S.D.N.Y. July 30, 2015); B.K. v. N.Y.C. Dep't of Educ., 12 F. Supp. 3d 343, 359 (E.D.N.Y. 2014); P.K. v. Bedford Cent. Sch. Dist., 569 F. Supp. 2d 371, 383 (S.D.N.Y. 2008).[15]

J.C.'s and Surdi's testimony alleges more than a mere professional disagreement.

---

[15]     The DOE also argues that IHO Noe "grappled with the contention that J.R. should have been classified as autistic instead of ID due to J.R's adaptive behavior and cognitive skills, the very arguments proffered in the Supplemental Evidence, and still found that the ID classification was appropriate." (DOE Br. at 16.)  IHO Noe, however, grappled without the additional expert testimony that Dr. Newman and Dr. Tabone would have provided, since she excluded their testimony.  (See page 7 above.)  Moreover, IHO Noe repeatedly relied on O'Sullivan's testimony (see 1/4/13 IHO decision at 8-12), but that testimony was effectively uncontested because of IHO Noe's erroneous decision to exclude the majoriy of J.C.'s witnesses.  For example, when IHO Noe stated that J.C. "at the time of the IEP meeting did not object to [J.R.'s] classification" (1/4/13 IHO Decision at 11), IHO Noe did not have the benefit of J.C.'s or Surdi's contrary testimony.  Finally, despite O'Sullivan's insistence that "[a]utism was an inappropriate classification" for J.R. (see page 6 above) and IHO Noe's finding that "the classification of intellectual disability was appropriate" (1/4/13 IHO Decision at 11), J.R.'s "2012 IEP changed [his] classification back to Autism" (see page 14 above).

Their testimony, if credited by IHO Noe, would have supported J.C.'s argument that significant parts of the IEP were not discussed at the CSE meeting and that its recommendations actually were predetermined before the CSE meeting ever took place.  (J.C. Ex. A: Impartial Hearing Request ¶¶ 42, 47(d); see pages 13, 15-16 above.)  "Predetermination of a student's IEP amounts to a procedural violation of the IDEA 'if it deprives the student's parents of meaningful participation in the IEP process.'"  A.P. v. N.Y.C. Dep't of Educ., 2015 WL 4597545 at *8; see also, e.g., T.P. v. Mamaroneck Union Free Sch. Dist., 55 F.3d 247, 253 (2d Cir. 2009); T.F. v. N.Y.C. Dep't of Educ., 14 Civ. 3401, 2015 WL 5610769 at *5 ("The IDEA requires that parents of children with disabilities be given an active role in developing their child's IEP."); B.K. v. N.Y.C. Dep't of Educ., 12 F. Supp. 3d at 358.  "For an IEP to be predetermined, the district must 'not have an open mind' to consider alternative programs or services during the meeting."  A.P. v. N.Y.C. Dep't of Educ.,  2015 WL 4597545 at *8 (quoting T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d at 253); B.K. v. N.Y.C. Dep't of Educ., 12 F. Supp. 3d at 358.

J.C.'s and Surdi's testimony clearly portrays a CSE meeting in which J.C. was unable to meaningfully participate.  According to J.C., O'Sullivan did not review the results of J.R.'s psycho-educational testing or other assessment reports and "did not ask anyone if they agreed or disagreed with his conclusion."  (See page 13 above.)  Both J.C. and Surdi testify that they repeatedly objected to classifying J.R. as ID and objected to the DOE's recommendation of a 12:1:1 placement for J.R.  (See pages 13, 15-16 above.)  O'Sullivan denies that they made these objections, but also admits that, in any event, he "would not have changed a child's classification if the parent had disagreed with the evaluations or expressed a belief that they were in any way insufficient."  (See page 6 above.)  Finally, O'Sullivan claims that the CSE team considered other recommendations before settling on a 12:1:1 placement in a public school (see pages 6-7 above),

and that J.R.'s "mother, as well as the representatives from the Cooke Center fully participated in the discussion" (see page 7 above).  According to Surdi, however, O'Sullivan read pre-drafted portions of the IEP, "stated that the CSE team had determined that [J.R.'s] classification should be changed from Autism to Intellectually Disabled," did not review many portions of the IEP, and "stated the CSE team was recommending a District 75, 12:1:1 special class." (See page 15 above.)[16/]

Finally, the DOE claims that J.C. "does not explain anywhere in her memorandum how the allegedly inappropriate classification of J.R. would have deprived him of the educational benefits to which he was entitled.  She asserts that the excluded evidence would have supported a different classification, but she fails to connect this assertion to an allegation that the offered program was inappropriate." (DOE Br. at 18-19.)  Even assuming that the DOE generally is correct that "the law is clear that school districts are not required to classify a student in a particular category" and "'the only relevant question is whether the Student was offered FAPE,'" M.H. v. N.Y.C. Dep't of Educ., 10 Civ. 1042, 2011 WL 609880 at *12 (S.D.N.Y. Feb. 16, 2011); see also, e.g., 20 U.S.C. § 1412(a)(3)(B) ("Nothing in this chapter requires that children be classified by their disability so long as each child who has a disability . . . is regarded as a child with a disability under this subchapter."), New York State provides additional educational protections specifically to students classified as autistic, see 8 N.Y.C.R.R. § 200.13.  Similarly, IDEA regulations recognize that autism, in particular, significantly effects a child's "verbal and nonverbal communication." 34 C.F.R. § 300.8(c)(1)(i).

Moreover, the evidence that IHO Noe excluded from the December 20, 2012

---

[16/]    Draft IEPs are permissible under the IDEA as long as the district maintains the requisite open mind during the meeting.  See, e.g., B.K. v. N.Y.C. Dep't of Educ., 12 F. Supp. 3d at 358; M.M. v. N.Y.C. Dep't of Educ. Region 9 (Dist. 2), 583 F. Supp. 2d 498, 506 (S.D.N.Y. 2008).  J.C.'s and Surdi's testimony, if credited, indicates that the DOE did not.

impartial hearing included testimony about how J.R.'s inappropriate classification resulted in a substantively deficient IEP.  First, J.C. claims that "the DOE's erroneous classification of J.R. was one of the errors that led the DOE to ultimately recommend" a 12:1:1 program that was inappropriate because "J.R.'s profound language impairments are one of the reasons he would not have been able to make progress in a 12:1+1 classroom." (Dkt. No. 23: J.C. Reply Br. at 12.)  Both Sasson's and Surdi's affidavits support these claims.  (See pages 15-16 above.)  Second, Dr. Newman opined in his affidavit that the educational program for a child classified as ID would be "very different" than for one classified as autistic.  (See pages 14-15 above.)[17]

In response, the DOE asserts that "the supports for J.R.'s behavior in his IEP correspond precisely to behavior J.R. actually manifested" (DOE Br. at 20), and that "regarding the program's emphasis on educational services relative to the emphasis on adaptive skills, the vast majority of the goals on J.R.'s IEP are academic" (id. at 21).  The DOE identifies multiple similarities between the IEP's stated behavioral goals for J.R. and behavioral issues identified in his progress reports, and asserts that the IEP and the Cooke program J.R. ultimately attended emphasized academic skill relative to adaptive behaviors to a similar degree.  (See id. at 20-21.) This argument does not address J.C.'s claim that classification as ID was one of the errors that led

_____

[17]   J.C.'s and Surdi's affidavits contain evidence that the specific placement recommended for J.R. at P.S. 226 would not have been appropriate for him.  (See pages 13, 16 above.)  Both state that an administrator at P.S. 226 told them that one of the two 12:1:1 classes at P.S. 226 was too low-functioning for J.R., while the other was not suitable because it was for older students with behavioral issues.  (See pages 13, 16 above.)  Those deficiencies correspond to the different allocation of educational resources for ID students to which Dr. Newman attests. (See page 15 above.)  Under Second Circuit precedent, however, "'[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement.'"  F.L. v. N.Y.C. Dep't of Educ., 553 F. App'x 2, 9 (2d Cir. 2014) (quoting R.E. v. N.Y.C. Dep't of Educ., 167, 195 (2d Cir. 2012), cert. denied, 133 S. Ct. 2802 (2013)); H.C. v. N.Y.C. Dep't of Educ., 14 Civ. 1927, 2015 WL 1782742 at *3 (S.D.N.Y. Apr. 9, 2015) (collecting cases).

the DOE to recommend a 12:1:1 classroom that would not have been appropriate for J.R. based on his language needs and need for individualized instruction.  Thus, J.C.'s supplemental evidence undermines the DOE's claims that "the evidence reveals that the emphasis on academics [in J.R.'s 2011-12 IEP] was appropriate for J.R.'s needs."  (DOE Br. at 21.)

### 2.   J.C.'s Supplemental Evidence Supports Her Challenge To The Sufficiency Of The DOE's Evaluation Of J.R.

The DOE argues that although J.C. "purports to dispute Mr. O'Sullivan's testimony that the DOE evaluations were appropriate and adequate," the substance of her argument is "redundant of her 'classification' argument" and should be dismissed for the same reasons.  (Dkt. No. 22: DOE Br. at 22.)  As discussed above in section III.D.1, however, J.C.'s supplemental evidence supports her argument that by incorrectly classifying J.R. as ID, the DOE denied J.R. a FAPE. (See pages 32-38 above.)

The DOE also argues that under 20 U.S.C. § 1414 "the evaluative material provided everything the IDEA requires," and asserts that J.C.'s "attorney admitted on the record that Dr. Tabone's affidavit did not question the sufficiency of the DOE evaluations."  (DOE Br. at 22-23, citing Tr. 233.)  The IDEA requires that students be reevaluated at least every three years, 20 U.S.C. § 1414(a)(2)(B)(ii), and that existing data on the student, including information provided by the parents and teachers of the child, be reviewed to determine what additional data, if any, must be obtained to properly evaluate the student's needs, 20 U.S.C. § 1414(c)(1).  There is no question that the DOE conducted its triennial reevaluation of J.R. on schedule by performing the 2011 psycho-educational and other evaluations of J.R.  (See page 2 above.)

J.C.'s argument, however, is that the DOE relied on insufficient testing to properly evaluate J.R. and that the DOE drew incorrect conclusions from the material it did rely upon.

(See Dkt. No. 23: J.C. Reply Br. at 14-15.)  The DOE is correct that Dr. Tabone's affidavit does not specifically challenge the sufficiency of the materials that DOE relied upon to evaluate J.R.  (See page 17 above.)  Nonetheless, as discussed above in section III.D., the Court has already found that Dr. Newman's and Dr. Tabone's testimony supports J.C.'s argument that the DOE drew incorrect conclusions from J.R.'s evaluation results.  (See page 31 above.)  Moreover, Dr. Newman's affidavit is clear that, in his opinion, the DOE did not sufficiently evaluate J.R.  (See page 14 above.)[18]

### 3.   J.C.'s Additional Evidence Is Consistent With Her Claim That A 12:1:1 Program Was Not Appropriate For J.R.

The DOE also argues that "[t]he staffing ratio, related services, goals and management strategies in the IEP catered to [J.R.'s] individual needs.  Plaintiff nonetheless implies that the program was not appropriate, asserting that 'there were objections to J.R.'s placement in a 12:1:1 classroom' and citing the excluded affidavits of J.R.'s mother J.C. and his teacher, Ms. Surdi. But the cited objections do not constitute evidence of any defects in the recommended program." (Dkt. No. 22: DOE Br. at 23, record citations omitted.)  Specifically, the DOE argues that J.R's 2010-2011 progress report does not corroborate Surdi's opinion that a 12:1:1 ratio would offer J.R. insufficient academic support because the progress report allegedly states that J.R. succeeded in a

---

[18]   The DOE's reliance (DOE Br. at 22-23) on T.F. v. N.Y.C. Dep't of Educ.,14 Civ. 3401, 2015 WL 5610769 at *4-5 (S.D.N.Y. Sept. 23, 2015), is misplaced.  In T.F., the District Court held that a CSE which relied on a Cooke progress report from two months prior to the IEP meeting, classroom observation by the CSE chair, the preceding year's IEP, and a recent psycho-educational evaluation had sufficient evaluative materials.  The Court also held that "[e]ven assuming that the failure to conduct an updated evaluation constituted a procedural error, there is no evidence that this omission resulted in the denial of a FAPE."  Id. at *4. The circumstances here, however, are readily distinguishable.  First, J.R.'s CSE chair, O'Sullivan, testified that he never met J.R. in person.  (Tr. 33.)  More importantly, the plaintiff in T.F. introduced no new evidence that had not been before the IHO or SRO.  Id. at *5.  In contrast, J.C. has introduced evidence that was not before either the IHO or the SRO that directly challenges both whether the DOE had sufficient material to properly evaluate J.R. and whether the DOE drew the correct conclusions from the material in its possession.

twelve-student social studies class and an eight-student math class and Surdi claimed that J.R. requires a 1:1 ratio.  (DOE Br. at 24.)

In response, J.C. asserts that "the report shows that J.R. received academic instruction in smaller settings at Cooke than he would in the DOE's recommended program" and that therefore "the report is consistent with [J.C.'s] and Ms. Surdi's concern that J.R. would not receive adequate support in a 12:1+1 classroom. " (Dkt. No. 23: J.C. Reply Br. at 10, record citations omitted.)  J.R.'s progress report states that he participated in a seven student "word study group," a writing group with "four other students, one teacher and one paraprofessional," and in a math study group with "seven other students."  (DOE Ex. 8: Mar. 2011 Progress Report at 4-6.)  Sasson's affidavit also corroborates Surdi's statements about J.R.'s academic needs.  (See page 15-16 above.)  Moreover, the DOE's witnesses did not directly observe J.R., while both Sasson and Surdi are familiar with how J.R. learns and functions.  (See pages 7, 15-16, 40 n.18 above.)  Thus, Sasson's and Surdi's testimony would have been probative of whether the 2011-2012 IEP offered to J.R. provided a FAPE.  See, e.g., C.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 81 (2d Cir. 2014) (DOE denied student a FAPE where "before the IHO, all witnesses familiar with" the student testified that he needed a more individualized program); S.B. v. N.Y.C. Dep't of Educ., 14 Civ. 349, --- F. Supp. 3d ----, 2015 WL 3919116 at *10 (S.D.N.Y. June 25, 2015) ("[T]he SRO's reliance on one district special education teacher's contention that [the student] did not require 'any additional teaching support' over the testimony of two teachers who knew [the student] and taught [the student] in class—without noting the IHO's finding of credibility for or against any witness—flies in the face of reason.") (fn. & emphasis omitted).

The DOE also points out that according to J.R.'s January 2011 social history update, J.C. refused a recommendation by Cooke to place J.R. in an 8:1 classroom setting.  (DOE Br. at 24.)

According to the social history update, Cooke "told [J.C.] during an annual review meeting held in August, 2010, that [J.R.] needed a smaller setting (8:1) and support services.  [J.C.] refused the placement of an 8:1 setting and kept [J.R.] in his present placement of 12:1."  (DOE Ex. 5: 1/22/11 Social History Update at 2.)  In response, J.C. argues that "this statement is inconsistent with the . . . March 2011 progress report that shows J.R. placed in groups of five-to-eight students during the 2010-2011 school year."  (J.C. Reply Br. at 10-11.)  J.R.'s progress report clearly states that he participated in smaller classroom groups in at least three subjects during the 2010-11 school year: reading/word study, where he was in a "group with six other students" (Mar. 2011 Progress Report at 4); writing "with four other students" (Mar. 2011 Progress Report at 5); and math, in a "group with seven other students" (Mar. 2011 Progress Report at 6).[19]   Moreover, the 2011 social history update corroborates Surdi's claim that an 12:1:1 placement would not be appropriate for J.R. by noting that Cooke "told [J.C.] during an annual review meeting held in August, 2010, that [J.R.] needed a smaller setting (8:1) and support services."  (1/22/11 Social History Update at 2.)  Thus, far from proving that J.C.'s "objection to the twelve-student classroom is disingenuous" as the DOE claims (DOE Br. at 24), the social history update underscores the importance of the testimony that J.C. and Surdi could have offered.

## IV.   THE CASE SHOULD BE REMANDED FOR A NEW IMPARTIAL HEARING

In challenging SRO Steinbock-Pratt's decision in this lawsuit, J.C. "requests that the Court vacate the SRO's decision and remand this case for a new impartial hearing."  (Dkt. No. 20:

---

[19]   The DOE counters by arguing that J.R.'s 2011 progress report states "'[s]ocial studies instruction is presented to the whole class in their homeroom groupings'" and therefore supports the claim that J.R. learned social studies in a group of twelve.  (Dkt. No. 24: DOE Reply Br. at 8 n.2; Mar. 2011 Progress Report at 7.)  Nonetheless, the progress report is clear that in three other subjects, J.R. did <u>not</u> receive instruction in a group of twelve students.

J.C. Br. at 30; see also Dkt. No. 1: Compl. Wherefore ¶ 3.)  In IDEA cases, a "district court may remand the proceeding for further development and clarification of the record."  T.L. v. N.Y.C. Dep't of Educ., 938 F. Supp. 2d 417, 437 (E.D.N.Y. 2013); see also, e.g., E.M. v. N.Y.C. Dep't of Educ., 758 F.3d 442, 463 (2d Cir. 2014); M.T. v. N.Y.C. Dep't of Educ., 47 F. Supp. 3d 197, 208 (S.D.N.Y. 2014).

As discussed in section III, SRO Steinbock-Pratt erred in determining that J.C suffered no prejudice from IHO Noe's mistaken exclusion of five of her seven witnesses at the December 20, 2012 impartial hearing.  Moreover, the witness affidavits that IHO Noe excluded, and that J.C. has submitted to this Court, are not the entirety of the evidence that J.C.'s witnesses might have presented at the December 20, 2012 impartial hearing.  IHO Noe's Prehearing Order stated that in addition to cross-examination, "[a]dditional direct examination that is not repetitive or irrelevant will be allowed."  (IHO Ex. I: 10/23/12 Pre-Hearing Order.)  Thus, as J.C. argues, her "attorney would have had the opportunity to ask additional questions to address issues that arose at the hearing.  [Thus t]he statements and affidavits . . . illustrate the harm causes to [J.C.'s] claim for relief, but do not represent all of the testimony that she could have presented."  (Dkt. No. 23: J.C. Reply Br. at 9, record citation omitted.)  A remand will permit further development of those witnesses' testimony, as well as afford the DOE the opportunity to cross-examine their claims regarding the basis of J.R.'s evaluation, the conduct of the CSE meeting, and the adequacy of the DOE's recommended placement for J.R.

Furthermore, J.C.'s witnesses' testimony, whether by affidavit or on examination, would have raised questions about the adequacy of the DOE's evaluation of J.R. and the adequacy of its proposed classroom placement.  Because IHO Noe excluded their evidence, however, the Court lacks sufficient administrative guidance to determine whether the DOE in fact provided J.R.

a FAPE.  Without such guidance, it would be imprudent for the Court, which is not an expert in educational policy, to resolve the issue in the first instance.  See, e.g., E.M. v. N.Y.C. Dep't of Educ., 758 F.3d 442, 463 (2d Cir. 2014) ("It would be imprudent for this panel, without any educational expertise, to decide the merits of [the parent's] claim on a cold record."); M.T. v. N.Y.C. Dep't of Educ., 47 F. Supp. 3d at 208-09; J.F. v. N.Y.C. Dep't of Educ., 12 Civ. 2184, 2012 WL 5984915 at *10 (S.D.N.Y. Nov. 27, 2012) ("[T]he adequacy of [plaintiff's child's] proposed classroom placement involves important questions of state educational policy and requires educational expertise to resolve.  It is a question this Court is ill-equipped to decide in the first instance."), reconsideration denied, 2013 WL 1803983 (S.D.N.Y. Apr. 24, 2013).  Thus, this case should be remanded for a new impartial hearing consistent with this opinion.

## CONCLUSION

For the foregoing reasons, the DOE's motion for summary judgment (Dkt. No. 21) should be DENIED.  J.C.'s motion for summary judgment (Dkt. No. 19) should be GRANTED and the case remanded for a new impartial hearing.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, 500 Pearl Street, Room 2240, and to my chambers, 500 Pearl Street, Room 1370.  Any requests for an extension of time for filing objections must be directed to Judge Kaplan (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v.

Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).


Dated:        New York, New York
              December 16, 2015


                                          Respectfully submitted,

                                          _____
                                          **Andrew J. Peck**
                                          United States Magistrate Judge


Copies **ECF**:   All Counsel
                  Judge Lewis A. Kaplan